MARGARET J. MITCHELL v. WILLIAM B. MITCHELL and Another.[1]

January 8, 1895.

No 9000.

**Verdict Held Excessive.**

*Held*, the verdict in this action is excessive, and a new trial should be granted, unless plaintiff consents to remit all of the same in excess of $500.

Appeal by defendants from an order of the district court for Stearns county, Searle, J., denying their motion to set aside a verdict and for a new trial, in an action for damages for malicious entry and assault. Reversed on condition.

*Geo. W. Stewart* and *Geo. H. Reynolds*, for appellants.

*Bruckart & Brower*, for respondent.

CANTY, J. Many of the material facts in this case appear in the statement of facts and opinion in a former appeal. See 54 Minn. 301, 55 N. W. 1134. After being then remanded, it was again tried in the court below. The jury found a verdict for plaintiff, and against both defendants, for the sum of $1,000, and from an order denying the motion of defendants for a new trial this appeal is taken.

[1] Reported in 61 N. W. 682.

We are of the opinion that the assignments of error to the admission of evidence and the charge and refusal to charge are none of them well taken, and are not of sufficient importance to warrant any particular discussion of them.

It is urged that the court below erred in refusing to grant a new trial, on the ground that the damages are excessive. It seems to us that the point is well taken. The defendants are the brothers of plaintiff's deceased husband. She testifies that they came to her house about 6:30 p. m., and, gaining admission with her consent, informed her that they had been appointed special administrators under the will of her late husband, and demanded all the books and chinaware, a part of which belonged to her. They testified that they demanded only those which had been, by her husband's will, left to his sisters. She informed them that the doors to the rooms containing the articles were locked, and they could not have them. She further testified: " 'Now,' he says, 'if you don't open the doors, I will break them down.' I says: 'I don't think you will do that. I don't think you dare to, and I don't think you would break those nice doors.' 'Yes,' he says, 'I am just prepared to do anything.' " That they had with them their two hired men. That she went out, and on her way up town met another man, and sent him after her lawyers; then met a police officer and returned with him to her house about 7:30 p. m. That, shortly after, she ordered defendants out of the house, and they refused to go and ordered the two hired men also to remain, against her objection. That plaintiff's two daughters, one 15 and the other 8 years of age, were then in the house. She had left the police officer outside, and it appears that he was at this time in the house or around on the premises. She further testified: "Q. What then was said? A. I saw they [the defendants] would not go, and I commenced to tell them of all the meannesses they had done to me before; and Charles stepped up and drew his fist, and said, if I didn't hush up, he would strike me. Q. What was his attitude? A. His attitude was his fist drawn near me. And I was going on to tell them more of their meannesses, and W. B. stepped up and said, if I didn't hush up, he would slap me. Q. What was his attitude? A. His attitude was his hand drawn, and he was standing right near me. He didn't have to come near me at all. I was standing near him. Q. What else was said? A. When Charlie stood up and was going to strike me,

W. B. said: 'Don't mind her. We can send her to the penitentiary for forgery.' And when W. B. stepped up and was going to strike me, Charlie said: 'Don't mind her. She's crazy. She ought to be in a lunatic asylum.' Q. What further was done? A. I think I left the room then. No. The second time I·was talking on, and Charles stepped up the second time, and was going to strike me; and at that point I left the room, and left them in possession." This testimony is corroborated by that of her daughter Laura, except that Laura testifies that W. B. Mitchell did not threaten to slap plaintiff, but said that "if she were a man he would slap her jaws." Taking the evidence most favorable to plaintiff, this is substantially all the violence offered or threatened by either defendant. Substantially, the only evidence of the effect of these unlawful acts upon the plaintiff or her health is the following: She testified: "Q. What was your mental and nervous condition at this time? A. I was very nervous, and was not feeling well at the time. Q. Now, what was your physical condition at this time? A. I was in very poor health at the time. I had nursed Mr. Mitchell [her husband] all winter, day and night, up to April 20." Her daughter Laura testified: "Q. What was your mother's condition before this? A. She was very much excited during this time, and afterwards she was sick for several days,—I don't remember just how long she was in bed,—and had a physician. Q. How was she before this? A. She was not well, but there was no excitement. She hadn't been well the whole winter."

This is not sufficient proof that the wrongful acts caused any permanent injury to the health or person of plaintiff. This being so, the utmost amount of compensatory damages which can be awarded her is but a small part of $1,000. The charge is wholly silent as to the right of the jury to award punitive damages, but it seems to us that it must be held that this verdict is composed principally of such damages. Neither are we prepared to say that the acts of the defendants were not sufficiently oppressive to justify the award of some punitive damages. But it sufficiently appears, by plaintiff's own admissions and the uncontradicted evidence of defendants, that, to a considerable extent, she brought upon herself the threats of violence to her person, by her own abuse of the defendants and the wife of one of them. Of course, it must also be taken into consideration that she had ordered them to leave her

premises before she commenced abusing them. But the best that can be said for any of the parties is that each was taking part in an unseemly family row. To say the least, the defendants seem to have had a very exaggerated idea of their authority as such special administrators, and their course was wholly unjustifiable, but still there should be a reasonable limit to the punishment which a trial jury may impose upon them. They did not carry out any of their threats. They got none of the property in controversy by force, but, after demanding the property and making the threats, one of them went up town about 8 o'clock, and got out replevin papers, and returned with the sheriff about 11:30 p. m. to take the property, while the other remained upon the premises. Then she voluntarily surrendered to them the property which she conceded was left by her husband. We are of the opinion that the verdict is palpably excessive, and in disregard, not only of the charge, but also of the law; that, under all the circumstances of the case, the utmost amount for which we could permit a verdict to stand is the sum of $500.

It is ordered that a new trial be granted, unless the plaintiff, within 10 days after written notice of the filing of the mandate from this court in the court below, file a stipulation remitting all of said verdict in excess of said sum of $500, and that if such stipulation is so filed said verdict stand for that amount.

BUCK, J. (dissenting). I dissent from that portion of the opinion which holds that the verdict of the jury is excessive, and that a new trial should be granted, unless the plaintiff consent to remit all of the same in excess of $500. The law is too well settled to need the citation of authorities that a verdict will not be set aside upon the ground of excessive damages, unless the amount of the verdict is so large and disproportionate as to furnish proof in itself that the jury were influenced by passion, prejudice, corruption, partiality, gross ignorance, or mistake. It may be that this court, sitting as a trial jury, would have reached a conclusion different and adverse to that reached by the jury in this case, but that alone does not justify us in interfering with the verdict. This is an action for a personal tort, and the measure of damages therefore is necessarily uncertain; and courts should rarely interfere unless some bias

or improper influence has governed the jury, whereby they have disregarded the law.

I think that the opinion of the majority of the court trenches upon the province of the jury and is not warranted by the facts in the case. The next day after the burial of their brother, the husband of plaintiff, these defendants went to plaintiff's home accompanied by other persons, and, after gaining admittance to the house, threatened to break down the inside doors; and one of them stepped up to plaintiff, and said that, if she did not hush up, he would slap or strike her. The other defendant then said: "Don't mind her. We can send her to the penitentiary for forgery." The other defendant said: "Don't mind her. She is crazy. She ought to be in a lunatic asylum." When the plaintiff remonstrated with the defendants against breaking the doors, one of them answered that "he was just prepared to do anything." One of the defendants carried away the key to the outside door, and plaintiff was unable to lock it. They remained in the house until past midnight. The plaintiff was in poor health and very nervous at the time, and had to remain in bed a week or more on account of the acts and conduct of the defendants. I have not recited all of the acts of wrongdoing on the part of the defendants, as gathered from the testimony on the part of the plaintiff. Very much of this evidence was denied by the defendants, but the weight of the evidence was a matter for the jury to determine. In my opinion, the tort of the defendants was a very aggravated one, and wholly indefensible. They evidently went to the plaintiff's home prepared for violence or force, if necessary. They gained admittance to the house without rapping, and then used slanderous and threatening language to a sick woman, immediately after the death of her husband. It was an indecent and unlawful proceeding on the part of the defendants, and I am of the opinion that the facts fully justified the verdict rendered by the jury. There had been no demand by the defendants for the property sought to be obtained, and aside from the unseemly haste in thus going to a house of mourning, with its sick inmate, it was clearly a case where they went prepared to use force, if necessary, to obtain possession of personal property without judicial process or authority. It would have been an easy matter for the defendants to have made a demand of plaintiff for the prop-

erty, and, in case of her refusal to deliver it, they then could have invoked the aid of the law, instead of violating it, as is conceded by the opinion of the majority of this court. Those who invade the sanctity of home and abuse its privileges, as the jury must have found the defendants did in this case, should have the full measure of legal damages meted out to them. I do not think courts should interfere with the verdict of jurors in cases of this kind, except in those cases where there has been a palpable disregard of the law. A jury, on the trial, has a far better chance to decide, from seeing and hearing the witnesses, noticing their demeanor, and becoming familiar with all the attending circumstances of the trial, than an appellate court. I think that verdict should stand for the full amount rendered by the jury, viz. $1,000.